This morning is Flynn v. FCA USA. Mr. Polanski. Thank you, Your Honor. May it please the Court, I, Jay Polanski, for plaintiff appellant. Every one of the hundreds of thousands of members of the certified classes in this case paid for safe cars but got unsafe cars. That's a concrete injury providing standing. The dangerousness of the defects is demonstrated by many aspects of the record, but perhaps none better than the hack that was the subject of the July 2015 Wired Magazine article. That hack involved only some of the defects and problems at issue in its litigation, but still it showed how because of the defects in the design of the vehicle's internal communication architectures, the CAN buses, and their infotainment system, the Uconnects, hackers could control virtually every function of the vehicle while they were being driven, including critical operational and safety functions like steering, braking, acceleration, and ignition. The District Court's order and the defendant's brief ignore all of this. The District Court did not find that the products are safe, and the defendants don't claim that they are. Instead, in finding that there's no standing, the District Court applied the wrong standard, engaged in the wrong analysis, and relied on factual findings that contradict the record. As our briefs explain, where a standing analysis is intertwined with factual findings relating to the substantive elements of the claim, a court cannot engage in an indirect attack on the merits. In that situation, or that form of a standing challenge, the court has to treat it as a motion for summary judgment. That's not what the District Court did here. The District Court assumed the role of the jury, made factual findings relating to the core elements of our claim, and worked backwards to hold that there was no standing. Not only is that approach impermissible, but the District Court's findings can't be squared with the record. As just one example, there are hundreds of pages of expert reports and hundreds more pages of expert deposition testimony which, at a bare minimum, create a genuine issue of material facts regarding whether these products are defective. Either the District Court impermissibly assumed the role of the jury in weighing that evidence, or it de facto struck those experts without conducting a Daubert analysis. Either way, the District Court's approach is now permissible and should be reversed. Mr. Blansky, the District Court's order seems to suggest, although it's a bit hard to tell, that she is addressing this as a facial challenge and just disagreeing with what Judge Reagan had previously decided. How do you respond to that? Because it wouldn't matter what the hundreds of pages of experts' reports say if this is just a facial challenge. She does treat it as a factual challenge to standing, and she relies on various aspects of the record, not just the materials that were submitted or referenced in connection with at the same time here. There were Daubert motions challenging every one of the experts, two motions for summary judgment, a motion to decertify the class, and a couple of other motions. And she does make reference to some of those aspects of the record. Now, we explained in our briefs that her treatment of the record is extremely superficial, and where she does address aspects of the record, she mischaracterizes it for the most part. But she does characterize it as a factual challenge to standing. If I could jump in here. To be fair to the district judge here, the arguments that were raised on your side at this juncture of the case on the standing issue didn't address the expert reports, etc., any of the factual material that was in the record at this juncture of the case. I understand that Judge Reagan's earlier orders were deciding the standing question on the pleadings. But here, we do have a different procedural posture. And yet, your argument on standing was all law and no facts, so far as I could understand it. And it's shifted on appeal. Now you're arguing facts, and that's a problem. I think that that's a fair characterization. I don't think that it is a problem. If you take a look at the basis for FCA's renewed 12v1 motion, it is essentially a legal argument. It's a six-page motion. There's virtually no reference to the record whatsoever. The only references to the record occur in two paragraphs, and it's essentially just for the point that the plaintiffs do, in fact, make the argument that an explanation of why these vehicles are unsafe includes the fact that they should have had things like gateways, trust anchors, and more segmentation in the canvas. But FCA's argument was that this line of cases that it mischaracterizes, FCA claims that it stands for the proposition that if a theory of injury can be characterized as asking for more safety, that doesn't provide standing. And so certainly the thrust of our response was to show that FCA's characterization of the principle in those cases was wrong. The problem here is that because the district court engaged in the wrong analysis and applied the wrong standing, she delved into the record to make findings that went well beyond the scope of FCA's motion. Her decision is based on her finding that it is quote-unquote unclear whether the UConnect is defective. And once she goes down that road, once she opens that door, that's when this intertwined principle is activated, and she needed to treat these motions as motions for summary judgment. Now, I think that one reasonable argument- Mr. Polanski, let me go back to my question, which is why I asked if this was a facial challenge or a factual challenge, because it did seem to be presented in the 12b-6 as a facial challenge, almost a motion for reconsideration of what Judge Reagan had done, yet the court may have gone further. I think that it's unclear. I think that the motion did present a tiny bit of record material that went beyond the allegations of the complaint. And on that basis, I don't think it was error for the district court to characterize it as a factual challenge. The error was introduced when the defendants took a somewhat different approach to standing. They assert that there's no standing because according to them, the affected vehicle, quote, performed exactly as advertised and expected, end quote. Consumers got exactly what they paid for. Consumers did not get what they being driven. And defendants' own documents show in no uncertain terms that the vehicles don't work the way they're supposed to. They don't work as advertised and expected. For example, one FCA PowerPoint presentation summarizes the issue. It says that hacks of these vehicles are, quote, a matter of when, not if. The defendants knew that hacks were inevitable, and they also knew what would happen when those hacks occurred. Because of the defects and the absence of defenses, hackers would have unfettered access to virtually every system in these products. There's an FCA email that says, quote, we are painfully aware of that. There's another email from an FCA employee begging managers to change exactly the aspects of the design at issue in this case because they knew how dangerous it was. Was that email before or after the recall where defendants claimed the problem was fixed? That was three years before the recall, in 2012. There are multiple penetration tests commissioned by FCA, finding dozens of vulnerabilities that the testers, Cisco, concluded were so glaring they could be exploited by semi-professional hackers or even hobbyists. And ultimately, the renowned cybersecurity expert, Mark Rogers, concluded, quote, this is one of the most concerning sets of vulnerabilities I've seen in any product. The possibility of harm is terrifying. These products don't work as advertised and expected, and consumers did not get the benefit of their bargain. In addition to the extensive evidence of defects in the record, there's also direct evidence that the financial harm suffered by the class members, and that includes the DCE analysis, discrete choice experiment analysis conducted by plaintiff's damages experts. So DCE is an advanced form of a conjoint analysis, and this is widely used and universally accepted. There are dozens of cases around the country that find that it's a reliable and accurate method for measuring damages in consumer class actions like this one. And this is a bit of an oversimplification. I'll ask if I could jump in here again. Is that report properly before us as the case comes to us on the standing issue? Because again, none of this was argued in the district court. Well, as I mentioned, the district court went beyond the scope of the 12B1 motion to include other aspects of the record. And she does, in fact, reference the survey that was conducted and the damages analysis. So I think that this is fair game. And in fact, here, the fundamental methodology, the principles of the DCE method actually refutes the defendant's core claim here. So this is a bit of an oversimplification, but essentially the way it works is it presents consumers with a choice in the form of a survey and says, imagine there are two vehicles. One has no defects, and the second one is identical, but it has the defects alleged in this case. What's the difference in value of those two vehicles? Now, the defendants say consumers got exactly what they paid for. If that were right, then by the very method, the principles underpinning this analysis, consumers would be indifferent to that choice. But that's not at all what was found in this widely used and universally accepted method. They found that the difference in value was $8,700 per vehicle. And what that means is the DCE analysis doesn't just quantify the damages. It does that by directly measuring the benefit of the bargain injury, the difference in value between what consumers expected and what they got. And so the DCE analysis itself refutes defendant's core position if consumers got what they paid for. Do we have any adversarial testing of this methodology? We cite a handful of cases, six or eight cases. No, I mean in this case. I mean, the method has been challenged in the same way that experts analyses always are in litigation. There were counter-experts, there were depositions, and the defendants have filed doubler motions. But that's sort of the point here is that there is a process for challenging expert opinions here. And this methodology is presumptively reliable. Case after case has found that. Was this doubler motion ruled on, Mr. Polanski? Did Judge Reagan rule on this one? He did. Judge Reagan found there are two steps. There was class certification discovery, there was merits discovery. At the class certification phase, we hadn't gone through the full analysis. We hadn't conducted the survey. But there was a very specific discussion in Mr. Kemp's expert report of exactly how the DCE analysis would be conducted. And Judge Reagan found that that was a reliable methodology and we had certainly done enough to withstand a doubler motion and provide the information that we needed to support class certification. The last point I would like to touch on is the ruling on the admissibility of this testimony for merits purposes. I'm sorry, what was that? There has not been a ruling, there was no ruling on the admissibility of this expert's opinion for merits purposes, as I understand. That's right. And so the defendants did file doubler motions against every one of our experts. And Judge Yandel decided the standing motion as the threshold motion, and the others were moved, and I guess they're pending if this case gets remanded. But the correct approach would have been for Judge Yandel to address those doubler motions if she thought there was some concern about the methodology. And if there isn't, if there's not something that's fatal to the methodology, then it needs to go to a jury. The district court can't assume that role as well. This all more or less returns to Judge St. Eve's first question, is that how should we treat this standing challenge on appeal? Because it appears to be in the nature of a reconsideration as she suggested, based on the law of standing, and whether this is one of those no-injury cases for which there is no standing, and not whether the damages expert's report is admissible and creates a factual issue on the loss. Well, as I said, I think that the district court was within her prerogative to treat it as a factual challenge. And when she does that, she does open it up to the record, and the record includes all of this information about the defect. It confirms the allegations that Judge Reagan relied on in finding that there was standing, and those allegations mostly related to this wired magazine hack. And the district court never addresses those. She never overturns those. As far as I know, the defendants don't challenge the record. The record only adds to that, whether it's evidence of the defects or the DCE analysis, which is proof itself, not only of the magnitude, but of the fact that the class members didn't get the benefit of their bargains, that there is an injury here. The Ninth Circuit's decision in the Cahan case? Well, I think that there are several differences there. First of all, the Cahan case found that the injury was purely speculative. It was a future injury. Here, we take the position, obviously, that the injury occurred in the past at the moment of purchase, just like in Cole. Second of all... That was the argument in, I guess it's Cahan, that the claim of overpayment was speculative. That's right. And the court said that there was no evidence that the allegations, it was a spatial challenge. The allegations were conclusory and unsupported by any facts. And that's a critical difference here. We have lots of facts showing evidence of the defects and the injury, both the defects and the financial... Okay, what about the out-of-pocket expenses? There's no out-of-pocket expenses. There are no out-of-pocket expenses. That's correct. The last point in Cahan... That was the Ninth Circuit's position, right? Well, I don't think that it was. That was one aspect of it, but the primary position was that the allegations were what the Ninth Circuit characterized as being conclusory and wholly unsupported by any facts. And even in our complaint, we have plenty of specific allegations of facts. And let me add that the Something More test, which doesn't apply outside the Ninth Circuit and did apply in Cahan, even if it applies, we would satisfy that here because we have very detailed allegations of the defect. That's one basis for satisfying the Something More requirement. And the other thing that the court mentioned was the possibility of an impact on the market. We have exactly that. We have the same form of evidence. The BCE analysis is a direct substitute for impact on the market. The reason you can't have impact on the market is precisely because of the defendant's deception. There can't be an impact on the market if consumers didn't understand the defects. And because of defendant's deception, consumers never understood the defects. And that's exactly why Dr. Williams explains this. That's exactly why the BCE analysis is necessary. But it's a direct substitute for the same type of impact on market price that even the defendant's cases find will be sufficient to support standing. Well, Mr. Flansky, is there any evidence of a real-world effect on the market after the Wired story came out? Well, it's not something that we studied. We eyeballed it. There didn't appear to be. But understand the reason. The reason is the defendants have always claimed that there were no defects. The Wired story comes out. Two days later, they're hand-forced. They institute this recall. The recall notice sent to every owner of one of these vehicles characterizes the problem as the potential for driver distraction and then says, if you participate in the recall, the problem will be fixed. So there was no reason for consumers to believe that there was a continuing problem. There wouldn't be any impact on the market because the consumers didn't know about the problem. And that's where the BCE analysis comes in. And I'd like to reserve the rest of my time for my rebuttal. That's fine. Um, Mr., is it Dunwoy? Dunwoy, Your Honor. Okay. Your turn. Good morning, Your Honors. May it please the Court. I want to first start with addressing one of the issues that Your Honors has brought up, and that's the issue about what did the plaintiffs think was a factual consideration or a factual challenge? I think the record is correctly viewed as showing that this was a factual challenge. And the record is also correctly viewed, and as the Your Honors have pointed out, the plaintiffs didn't rely on their experts. They didn't put in any evidence that they suffered an injury in fact. And that's what the issue was on that factual challenge. And plaintiffs, I think, have tried to confuse the issue a bit by arguing that a summary judgment standard should have applied. And then, of course, they didn't argue that in the District Court, but that's an argument that they make in this Court. But that's our argument is wrong for a couple of reasons, Your Honors. The first problem with that argument is that plaintiffs ignore what intertwined means in the case law. So they say here that the merits issues were intertwined with the jurisdictional issues. But I'll quote from a case that they cite in their brief. In that case, Garcia v. Copenhagen, one of the main cases they rely on is an 11th Circuit case cited at page 26 of their brief. At page 1262 of that opinion, the Court explains what intertwined means. And it says, the question of jurisdiction and merits of an action will be considered intertwined where a statute provides the basis for both the subject matter jurisdiction of the federal court and plaintiff's substantive claim for relief. That's clearly not the case here, Your Honors. Plaintiffs' claims are not brought under any statute that provides this basis for subject matter jurisdiction. And secondly, the Apex Court that the District Court relied on here in its opinion explains exactly what the District Court did. And that's a court from, or excuse me, that's a decision from the 7th Circuit in which this Court instructed District Courts how to treat these factual challenges. In a factual attack, and I'm quoting from the Apex case, meaning a factual attack on jurisdiction, the Court may proceed as it never did under Rule B, as it never could under Rule 12b6, which is a motion to dismiss standard, or under Rule 56, which is a summary judgment standard. Because that issue in a 12b1 motion is the trial court's jurisdiction. It's very power to cure the case. There is substantial authority that the trial court is free to weigh the evidence and existence of its power to cure the case. Your Honors, what the standing issue in this case comes down to at its core is how far is the law willing to go in allowing the purchaser of a product to maintain a lawsuit? Is the law going to allow the purchaser of a product to maintain a lawsuit where that product has functioned exactly as expected throughout its life for everyone who purchased it and has never been shown in the real world to fail? As of now, no court has allowed a lawsuit to proceed under those circumstances, and that should not change with this case. This is a case where the product functioned as expected and be used as intended and was equipped as promised. Now, plaintiffs here try to base their injury on an overpayment. They say, I paid more for my vehicles than they were worth. And depending on where you look in the record, they say I overpaid because my vehicle was hackable. I overpaid because my vehicle was defective. But it doesn't matter what label you try to put on it, Your Honors. The injury issue requires looking at what did plaintiffs actually pay for and what did plaintiffs actually get. For starters here, Your Honors, there are 1.2 million of the vehicles at issue sold. Each of those on average have been on the road for about six years now, which equates to about 80 or 90 billion miles, billion with a B miles driven by those vehicles, assuming a conservative 12,000 miles a year. During those many billions of miles, there has been not a single instance of a real world hack. There's not been a single known instance of any hacking attempt on those vehicles. And looking at plaintiffs' own experience, too, tells a similar story. They've driven their vehicles for tens of thousands, continuous normal use miles without incident. But is that a factual determination, Mr. Denoy? Is that a factual determination, especially given the expert testimony of the plaintiffs here? And specifically, is the question of whether or not there's a defect a factual question that the district court couldn't have made at the stage that it did? Your Honor, the district court did not make a defect determination. And whether or not a defect exists does not need to be decided to determine whether or not plaintiffs were injured. And we can look to the Cayenne cases and the Lawson cases to see that, because whether or not something is called defective or not does not change the circumstances of the plaintiffs or whether or not they've been injured. So a defect does not automatically equate with an injury, just like you see in Cayenne. But wouldn't it here, under the theory that plaintiffs are proceeding under, that they purchased an automobile that wasn't what they thought they were getting because it was defective? Wouldn't you have to make a determination about the defect in order to determine if they're injured? Well, no, Your Honor, because a defect does not equate with an injury. So you can have, like you had in Cayenne and the Lawson cases, an assumed-to-be-true allegation that there's a defect. But did that defect affect the vehicles in some way? Did it affect the plaintiffs in some way? Did it prevent them from using their vehicles? Did they have to go out and spend money to repair the vehicles? Did it affect the market on the vehicles? But that's not the theory that they've, those all might be separate theories, but that's not the theory that the plaintiffs have advanced here. What they're saying is they purchased a vehicle, they thought they were getting a vehicle that didn't have this potential to be hacked, but because it did have the potential to be hacked, they didn't get what they paid for. So I understand what you're saying, but that's not what was advanced by the plaintiffs here. Your Honor, I think the Cayenne court speaks directly to that. Just saying that I overpaid for a vehicle because it has a potential to be hacked is not a concrete injury. It's a speculative injury. So is it your, is it your position that, I'm sorry to interrupt you, Mr. DeWay, is it your position that the district court here addresses as a facial challenge or a factual challenge? Well, I think the district court looked at this as a factual challenge, explaining that it was following the analysis in the Apex case. And then what factual finding, if it's a factual challenge, what factual finding do you think the district court made? Well, the district court made findings that plaintiffs got what they bargained for. They got the vehicles that had Uconnects that operated as expected. And if that's the factual challenge, if that's the factual issue that the district court found, wouldn't it necessarily have to determine whether or not there's a defect to determine if they got what they wanted? Well, Your Honor, I think the Cayenne cases and the Lawson cases and other cases say that the injury issue is distinct from the defect. You have to look at what plaintiffs say the defect caused in terms of an injury. You can't just say under the law that I overpaid because I got a defect. That's simply putting a label on a product. How did that defect in the injury context affect plaintiffs or their vehicles? That is the issue that the district court looked at. And that's the issue when we look at Cayenne and we look at Lawson and other standing cases, they're looking at the injury issue. Yes, in those cases, just like this case in Cayenne, the plaintiffs allege my vehicle's defective, my vehicle's unsafe, and Lawson, they allege my vehicle's defective, my vehicle's unsafe. But just simply saying that and simply assuming even if that's true, it does not equate with an injury automatically. You have to take another step and you have to look at the injury issue separately. What are plaintiffs claims in terms of how they were injured? And here they were injured because they said they overpaid for their vehicles. They say they were injured by overpaying for their vehicles. Well, you have to look at what did they pay for and what did they get? Well, they got vehicles that they can use for tens of thousands of miles and have used every day since day one when they purchased them. They got vehicles that they never had to spend money on and they got vehicles that there has been no market impact in terms of their ability to resell those vehicles tomorrow. And that's what the district court looked at here, Your Honor, was what was the impact on plaintiffs in terms of them establishing an injury and found that there was no impact. When you filed your motion, which did appear to be a motion for reconsideration, but when you filed the motion to dismiss for lack of standing that the court ruled on here, did you raise this as a factual challenge as opposed to a facial? Because it appeared to me that you were just reiterating what you had raised before Judge Reagan and had not been successful with. Well, Your Honor, FCA moved after the close of evidence when it was clear that plaintiffs could not muster any evidence of an injury. So we did raise it as a factual attack, pointing out to the court that the plaintiff's only theory about a defect here was based on the notion, just like in Lawson, that the claim was that something additional could have been added to their vehicles that would have made them safer. And when plaintiffs had mustered no real-world evidence of an injury, so we did in a factual way cite to those facts in the record and pointed those facts out to the district court. And the district court looked at that and looked at the Lawson case, which, Your Honor, in that case, and let me back up here because it's important, I think, to get back to your question about the defect, too. When you ask plaintiffs what is defective about these vehicles, and the claim really is, right, in the target pairs of the Lawson case where they're claiming that my vehicles are unsafe because something more could have been done to make them safer in terms of adding additional components. But I want to quote from the Lawson case, and it teaches about an injury in fact that it cannot be premised on the loss of a safety benefit that was not part of the bargain to begin with. Now, Your Honors, plaintiffs try to distinguish the Lawson case and similar cases based on the claim that the vehicles there were unsafe unless they were misused in some way. But that's exactly the situation here because what plaintiffs are saying, they admit they can use their vehicles. They admit that they've been using their vehicles. And under their theory, these vehicles become unsafe if and only if, and that's a big if, some third-party criminal hacker genius figures out some way to hack them in the future. So this case is exactly like Lawson. This case is exactly like Cahan. So again, if this is a factual challenge, is that something the district court could determine at this stage, given the evidence before her? Determine what? Whether or not plaintiffs have been injured, Your Honor? Yeah, whether or not there had been a hack or the potential to be hacked in the future. Well, the Cahan case speaks to the potential to be hacked in the future. But I would never claim that they were injured because of a potential risk of a future hack. Because under Cahan, that's just based on pure speculation. That's fair. But you just said in order to determine if there's a defect, you'd have to determine the safety benefit and whether that was part of the bargain to begin with. And you linked that to future hacking. So maybe I misunderstood. I apologize, Your Honor. In terms of the safety benefit, you know, plaintiffs can point to nowhere in the record here where FCA U.S. made any promise relating to safety. This isn't even a case that's premised on the vehicles being misrepresented in any way. There's no claims here that my vehicle, that FCA U.S. represented my vehicle to have something that it did not have. The claims here are premised entirely on omissions. Plaintiffs saying you didn't tell me something that you should have told me and implied warranty. Plaintiff safety arguments, Your Honors, as I've said, make this case just like Lassen, which where the issue was my vehicles could have been made safer in some way by the addition of some additional components, which I didn't bargain for those components. So I couldn't have been injured by those components in terms of getting what I little remainder of my time to address plaintiff's experts' arguments. The survey that was conducted here asked internet survey respondents what they believe about the difference in value between a vehicle that was not hackable, which is a vehicle that doesn't even exist in the real world, and a vehicle that is susceptible to a hack in the future, which plaintiffs say is their vehicle. For Your Honors, that is an exercise rooted in the exact same speculation that the Kayin Court says is not a real injury. Plaintiffs can point to nothing in the real world showing that they've suffered any injury relating to the purchase of their vehicles. Thank you. Mr. Lassen. Thank you, Your Honor. I just wanted to highlight some of the unique aspects of Appellant Keith's claims against Harmon because at the time of the standing decision, Plaintiff Keith was the only remaining named plaintiff who had any claims still alive against Harmon, and he was not a purchaser of one of the vehicles. I think he's a good example of why there is a lack of standing. He only leased three of the vehicles. He used them for the entire duration of the three years. He testified that he considered them to be good transportation and safe, and he returned was more than two years ago. We think that's a prime example of someone who got what they bargained for, who has no standing consistent with the Kayin-Lassen decisions, and frankly, consistent with this Court's decisions. I think that this Court's decisions in Aquedots and Ike are entirely consistent with the reasoning that the Ninth Circuit lays out in Kayin. So we think that, you know, with respect to those issues, we do think, just to address some of the issues that were raised, we do think this was a factual challenge. We do think that the District Court made several factual determinations based on the record that were undisputed with respect to the lack of the hacking incidents, with respect to the fact that none of the plaintiffs have experienced any defects. They haven't had any manifestation of the defects, and that's why we think that Plaintiff Keith lacks standing here as to Harmon, who was only a component part manufacturer of the UConnect head units themselves. Now, with respect to the plaintiff's proof that they put on at the District Court, they did not put the damages expert testimony at play. It was certainly their duty to demonstrate that they had standing, and we think that that is important in considering whether they've carried their burden. But even if they were allowed to rely on that information, I think, as Mr. Dunois was just pointing out, there were serious issues with the use of the We've addressed that in the briefing, and it's certainly consistent with the GM ignition switch that says, contrary to what Mr. Polanski says, contract analysis is not universally accepted all the time. There are questions about whether it can be used in certain circumstances, and there are certainly questions when it's not performed properly, as was the case here, because the supply side part of the equation was not adequately considered. I want to touch just briefly on, unless there are any questions, certainly on the standing issues, I want to touch briefly on some of the issues that arise relating to the alternative grounds for affirmance. I think we've already addressed in our, in response to Mr. Polanski's supplemental authority, we think those issues are properly before the court. We're not asking to alter the judgment. The judgment here was a dismissal of prejudice, and that's what we're asking. It was mistaken, wasn't it? Judge Handel's dismissal with prejudice was mistaken. She decided the case on standing grounds, and so it should have been a without prejudice dismissal, so a cross appeal ordinarily would be required to bring up merits arguments. Your Honor, with respect to, I guess, two responses. First, there are cases where there's been dismissal of standing with prejudice. This court has suggested it should be without prejudice, but what it has said in the context of whether a cross appeal required is what's in the judgment matters, and here what the judgment was was a dismissal with prejudice. I think a different rule that would require a cross appeal, because even though you prevailed, you think that conceivably a court of appeals might say at some point in time that the actual judgment should have been, in this case, without prejudice, would result in a lot of people taking cautionary or precautionary filings across appeals, a lot of additional briefing. I think that's unnecessary given what this court has said, but more to the point, Your Honor, there are cases. This didn't come up in the briefing because it wasn't raised until the supplemental authority, but there are cases from this court that have suggested that the failure to challenge whether the dismissal should have been with prejudice or without prejudice has been waived by the plaintiff's in this case because they never raised that issue below or with this court in their briefing. So with respect to those issues, one of which is actually a subject matter jurisdiction issue itself, I'll touch on those briefly. There's the Magnuson-Moss Warranty Act claim where the Ninth Circuit in the Floyd decision has made quite clear that a Magnuson-Moss Warranty Act claim cannot proceed in federal court unless there are 100 named plaintiffs. We think the reasoning in Ninth Circuit is sound, and for that reason, the Magnuson-Moss Warranty Act claim should be dismissed. Even if it were permitted to proceed, there is a serious notice issue. There was no notice given here by Mr. Keith until several months after the class certification ruling and almost a week or so after he returned his last vehicle. There is a split in authority on this issue, but there are other cases even in the other and other judges from the Southern District of Michigan law does, and we know that because Judge Reagan dismissed the Michigan implied warranty claim precisely because of that lack of notice, and plaintiffs have not challenged that decision on appeal. So we know that if it's a Magnuson-Moss Warranty Act claim, it's connected to state law. If the state law claim fails, the Magnuson-Moss Warranty Act claim should fail. But weren't you given the opportunity to cure after the class was certified even though you didn't have notice? Well, Your Honor, the two of his vehicles had already been returned, and the third one was returned shortly thereafter. I believe Mr. Plansky uses that phrase when he says, when we got notice shortly after the class certification decision. So, but I don't think that's the key. This court has looked at whether you have an opportunity to cure in the Peterson case, I believe that they cited, but in doing so, they were applying a different state's law that does not require the is sufficient. Michigan doesn't hold that, and we know that from Judge Reagan's decision in this case. I think the other reasons for dismissal on the MCPA claim are clearly stated in the briefing, and I see that my time has expired. Before you finish up, I have a question about the cross-appeal issue and whether these arguments are properly before us. Is the failure to file a cross-appeal jurisdictional? Your Honor. And therefore non-waivable because this argument was raised late in the 28-J. Yes, and I guess, Your Honor, are you asking whether, is it possible that plaintiffs raised this issue because they did not raise the cross-appeal? I'm asking whether plaintiffs waived the cross-appeal issue because they didn't raise it the 28-J letter, and it could be considered waived if it's not jurisdictional, but if it's jurisdictional, in other words, the requirement to file a cross-appeal if it's jurisdictional, then it can't be waived. We believe that, while I have not found a case directly on point from the Seventh Circuit, Your Honor, we believe that it is waivable, and obviously, the cases that they rely on, and the P.F. Chang case, were cases that they discussed in their briefing. It certainly wasn't new authority, and as I said, there are cases suggesting that if you don't challenge a dismissal of prejudice, that you can waive that. So we think that this court can properly reach those issues because, as the court said in Jones, if you're not altering the judgment, if you're not seeking to alter the judgment, it's improper to file a cross-appeal. Well, that's the question about whether a cross-appeal is required at all. I'm talking about, let's assume a cross-appeal is required. Is that objection waivable? We do have old cases that say that if a cross-appeal is required and is not filed, then that's a jurisdictional defect. Yes, I understand, Your Honor, and what I said, and I apologize if I wasn't clear, I have not found a case that has said whether the plaintiffs can waive that issue by not challenging the failure to cross-appeal in their opening brief. That is what I was trying to say when I hadn't found a case within the circuit addressing that issue.  Mr. Polanski. You're still muted, Mr. Polanski, I think. We can't hear you. Thank you. Welcome to 2020, right? Mr. Dunlop represented that safety was not part of the bargain, that the defect was not part of the bargain. I respectfully submit that that's simply not correct. Safety is inherent in the bargain when it comes to these defects for vehicles. We all know that. Anybody who's ever seen a car commercial knows that safety is a critical aspect of it. FCA conducted a survey finding 85% of its consumers found safety to be an important consideration when buying cars and that they assumed that there would be a minimal level of safety in the cars they bought. In the Lassen case, it's very different. The Lassen case and the other cases the defendants rely on say that the safety at issue there was not part of the bargain. It was peripheral. In Lassen, it was a key fob that operated exactly as intended and it was only through consumers' misuse that they could become dangerous. That's not the case here. The safety defects here go to the fundamental operational and safety functions of this product. They are inherent in the benefit of the bargain. This case is more like aqueducts and coal and even removals and lures which find that overpayment damages do provide standing in particular where there's a defect or product danger. One way to conceptualize the injury here, if I may have just a few more seconds, is to imagine the scenario where a consumer goes into an FCA dealership. She's decided that she loves a Jeep Cherokee. She goes in. She picks the one she wants. She goes to the salesperson's office. She's about to sign on the dotted line. The salesperson says, hold on a second. Before you sign the contract, I have to tell you something. He explains the defects at issue here. It's basically the scenario from the DCE analysis. What the defendants are saying is that that person, that consumer would say, I don't care. I'm going to still buy this vehicle. I'm going to pay the same amount despite the fact that these are serious safety defects that are pretty scary. And I submit that that's exactly why the defendants never disclosed them to consumers, because they knew that it would change consumer behavior. They wouldn't buy the cars, or they'd pay less. And that's the injury here. It's very much like the informational injury in the Robertson case, Robertson v. Allied Solutions, 902-F3-690, where this court found that denying someone an opportunity, denying them information that would provide them with an opportunity to make an informed decision, provides standing. That's exactly what we have here. The defendants denied class members the information that they were due about these defects. They would help them. They deceived them into believing that these were safe vehicles when they weren't. And the result is reflected in the DCE analysis. This isn't Lassen, where it wasn't a safety issue that was inherent in the benefit of the bargain. We know from FCA's documents. We know from DCE analysis that the safety defects here are central to the bargain. Thank you. Our thanks to all counsel. The case is taken under.